**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

---

| | |
|---|---|
| **M.KATHLEEN McKINNEY, Regional Director of Region 15 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD,** | ) ) ) ) ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **vs.** | )  No. 14-2272 |
| | ) |
| **KELLOGG COMPANY,** | ) |
| | ) |
| **Respondent.** | ) |

---

**ORDER**

---

Before the Court is the April 15, 2014 Petition for Temporary Injunction under 10(j) of the National Labor Relations Act (the "Act"), brought by the General Counsel of the National Labor Relations Board (the "Board") through M. Kathleen McKinney, Director of Region 15 of the Board ("Petitioner"). (Corrected Petition, D.E. 5.) The Board seeks temporary relief against Respondent Kellogg Company ("Kellogg") for forcing impasse over non-mandatory bargaining issues and locking out employees at its Memphis, Tennessee plant in violation of 29 U.S.C. § 158(a)(1), (3), and (5).

On June 23, 2014, the Court denied Kellogg's motion to dismiss for lack of jurisdiction and granted Petitioner's motion

to consider the Petition based on the administrative record. (D.E. 53; D.E. 54.)

On May 27, 2014, Petitioner filed a copy of the administrative record.[1] (Notice, D.E. 45.) Petitioner filed a memorandum in support of the Petition on June 13, 2014. (Pet. Mem., D.E. 49.) On the same day, the Bakery, Confectionery, Tobacco Workers and Grain Millers International Union and its Local 252-G (the "Union") filed an Amicus brief in support of the Petition. (Amicus Brief, D.E. 48.) Kellogg responded on June 30, 2014. (Resp., D.E. 55.) Petitioner and the Union filed replies on July 10, 2014. (Pet. Reply, D.E. 61; Amicus Reply, D.E. 62.) Kellogg filed a sur reply on July 17, 2014. (Sur Reply, D.E. 65.) For the reasons that follow, the Petition is GRANTED.

## I. Background

This action arises out of a labor dispute between Kellogg and the Union. (Jt. Ex. 5 at 1.) Kellogg and the Union are bound by a mutually consented Master Agreement, which covers four Kellogg plants, including the Memphis plant, and is effective from September 30, 2012, to October 3, 2015. (Id. at 50; Jt. Ex. 1 at 2.) The Union and Kellogg were also parties to a Supplemental Agreement applying only to the Memphis plant, which

---

[1] Petitioner sought and obtained leave to submit the administrative record by compact disk, which is on file with the Clerk's office for the Western District of Tennessee, Memphis. The record citations in this Order reflect the exhibit titles on the affidavit attached to the compact disk.

was effective from October 22, 2010, to October 22, 2013. (See Supp. Agreement, Jt. 1.) Kellogg locked out the employees at its Memphis plant after Kellogg and the Union failed to agree to a new Supplemental Agreement before the existing Agreement expired. (See Letters, Jt. Exs. 12 & 13.)

Kellogg initiated negotiations for a new Supplemental Agreement on September 17, 2013. (Jt. Ex. 5 at 1; Bargaining Agenda, Jt. Ex. 6.) During the first negotiating session, Kellogg informed the Union that the Memphis plant needed to cut costs significantly to remain competitive for work within the Kellogg manufacturing network. (Jt. Ex. 5 at 1; Tr. Hearing Vol. 3 at 334.) Kristie Chorny, Senior Director of Labor Relations for Kellogg, said there was significant excess capacity in Kellogg's manufacturing network because demand for breakfast cereal had declined. (Trans. Vol. 3 at 334.) To curb costs, Kellogg wanted to change the "concept" of Casual employees (or "Casuals") and greatly expand their role at the Memphis plant. (Tr. Hearing Vol. 3 at 344.) Chorny told the Union that Kelllog "want[s] to redo the Casual employee to make them the employee of the future." (Meeting Tr., Jt. Ex. 3(a) at 9.)

Kellogg had proposed similar across-the-board cuts to wages and benefits for new employees during negotiations for the Master Agreement. (See 2005 Master Agreement Negotiations

Company Proposals, GC Ex. 3; Hearing Tr. Vol. 1 at 107-108.) During the 2005 negotiations for the Master Agreement, Kellogg proposed a two-tiered wage structure with a lower-paid "qualified Casual workforce" to be used regularly in its manufacturing facilities. (GC Ex. 3 at 2.) Kellogg made similar proposals during discussions preceding the parties' 2009 and 2012 negotiations of the Master Agreement, but the parties never agreed to implement a two-tiered pay structure as part of the Master Agreement. (See Hearing Tr. Vol. 1 at 112-116, 119-120.)

The Master Agreement provides that Casual employees must make $6.00 an hour less than Regular employees (or "Regulars"), but does not define Casuals, the scope of their employment, or provide for benefits. (Master Agreement, Jt. Ex. 2 at 67.) The Supplemental Agreement provides that Casuals are employed "to provide regular employees with relief from extended work schedules[.]" (Supp. Ag., Jt. Ex. 1 at 8.) There is no provision altering Casuals' pay or providing them benefits. Among other restrictions, "Casual employees will be limited to 30% of the total number of Regular employees." (Id.) Under Kellogg's 2013 proposal, there would be no cap on Casuals and no limits on their work within the Memphis plant. (See Chorny Test., Tr. Hearing Vol. 3 at 388.) The "only distinction going

forward between a regular and a casual employee" would be their wages and benefits. (Id.)

At the first meeting, the Union balked at Kellogg's proposed concept for Casuals, and the parties made no progress afterward. Kellogg's written agenda for the second negotiating session, held on September 18, 2013, stated that the Union had "flatly rejected Kellogg's proposal to expand the casual concept in Memphis [the previous day], and indicated it would not be providing a counter proposal." (Jt. Ex. 6 at 1.) During a negotiating session on September 26, 2013, Chorny said that Kellogg's proposal would change a Casual employee to "basically what a new hire is today." (Meeting Tr., Jt. Ex. 3(e) at 17.) Union representative Kevin Bradshaw ("Bradshaw") responded that Kellogg's proposal should be "negotiate[d] at the Master level," that Kellogg was trying to "force" the proposal on the Union, and that the Union would not negotiate over its details. (Id. at 18-19.)

In a negotiating session on October 9, 2013, Chorny continued to press the Union to agree to Kellogg's proposal or to propose amendments. She said, "I think you need to understand the Casual of today is no longer what we are talking about." (Jt. Ex. 3(j) at 2.) "The Casual of tomorrow will be different, they will have seniority rights, a probationary period, job bidding like a Regular employee [and] will be at the

negotiated [wage] rate for a Casual allowed for in the master."
(Id.) Bradshaw responded that the Union "would like to get away
from the Casual [concept] and just call them employees. You are
double talking, they are just employees." (Id.) Chorny replied
that Kellogg had "to classify them somehow and they do not have
the same benefits and wage[s] as a Regular. Casual is already
established and in place." (Id.) Chorny said that, under
Kellogg's new concept of Casuals, a 30% cap was unacceptable.
(Id. at 13.)

When questioned about the details, Chorny conceded to
Bradshaw that a Regular employee could be laid off for business
reasons and brought back as a Casual, to which Bradshaw replied:

> [T]he answer is hell no, you need to jerk that off the
> table. Hell no . . . . I have had companies pull this
> crap out there and then say we are going to lay them
> off for a while and then bring them back at new pay."

(Id. at 16.) The Union never provided a written counter offer
to Kellogg's new Casual-employee concept.

On October 16, 2013, Kellogg provided the Union its
"Last/Best Offer," informing it that Kellogg would lock out the
employees if the Union did not agree to the offer by October 22,
2013. (Last/Best Offer, Jt. Ex. 5 at 1.) To introduce the
offer, Kellogg wrote that its proposal would not "impact the
pay, benefits or terms of employment of our existing non-casual
regular employees[.]" (Id.) Kellogg's offer was consistent

6

with its demands during negotiations: the cap on Casuals was struck though and a provision was added allowing laid off Regulars to return as Casuals. (Id. at 4, 5, 6.) Casuals would make $6 an hour less than Regulars and would not have benefits. (Id. at 5.) Casuals were added to provisions throughout the proposal that had applied only to Regulars, such as the grievance procedure, making them indistinguishable from Regulars except for pay and benefits. (See generally id.; see also Tr. Hearing Vol. 3 at 388.)

Petitioner asserts that Kellogg's Last/Best Offer would alter the Master Agreement. The Master Agreement's Wage Appendix, under the heading "New Hire Progression Schedule," provides that "Regular employees will be paid according to the schedule shown below," which would not apply to new Casual hires. (Master Agreement, Jt. 5 at 66.) Historically, the parties bargained for changes to wages and benefits for new hires as part of the Master Agreement. (Hearing Tr. Vol. 2 at 234.) In the "Overtime" section, the Master Agreement provides "time and one-half will be paid for all hours worked in excess of the normal workday" and "[d]ouble time will be paid for all hours worked on Sunday." (Id. at 34.) In its Last/Best Offer, Kellogg proposes that Casuals would receive time and one-half only for hours in excess of 40 hours during a work week, and

would not receive double time on Sundays.  (Last/Best Offer, Jt. Ex. 5 at 7.)

On October 21, 2013, the Union's attorney, Samuel Morris, sent Chorny and Chris Rock, Kellogg's plant manager, a letter rejecting Kellogg's Last/Best Offer.  (Jt. Ex. 13.)  Morris asserted that Kellogg's proposals on Casual employees were proper only for Master Agreement negotiations.  (Id. at 2.)  "By insisting upon them as the price to avoid lockout," Morris stated, "the Company is breaching the Master Agreement as well as violating Sections 8(a)(1), 8(a)(5), and 8(d) of the Act." (Id.)  Kellogg locked out the employees on October 22, 2013. They lost their pay and insurance benefits.  (See Jt. Exs. 11 & 12.)

## II.  Jurisdiction

Under § 10(j) of the Act, 29 U.S.C § 160(j), this Court has jurisdiction over Petitioner's request for a temporary injunction pending the Board's resolution of the underlying unfair-labor-practice proceedings.  See 29 U.S.C. § 160(j); Schaub v. West Michigan Plumbing & Heating, Inc., 250 F.3d 962, 969 (6th Cir. 2001); Frye v. Dist. 1199, Health Care & Soc. Servs. Union, 996 F.2d 141, 143-44 (6th Cir. 1993) (per curiam). (See also Order, D.E. 53.)

## III.  Standard of Review

In deciding whether to grant a § 10(j) injunction, courts apply the "reasonable cause/just and proper" standard employed by the Sixth Circuit Court of Appeals and district courts in this circuit. Ahearn v. Jackson Hosp Corp., 351 F.3d 226, 234 (6th Cir. 2003); accord Schaub, 250 F.3d at 969; Glasser v. Heartland-University of Livonia, 632 F.Supp.2d 659, 665 (E.D. Mich. 2009). "Specifically, the 'reasonable cause/just and proper' standard requires that a district court find that (1) there is 'reasonable cause' to believe that unfair labor practices have occurred, and that (2) injunctive relief with respect to such practices would be 'just and proper.'" Ahearn, 351 F.3d at 234 (quoting Schaub, 250 F.3d at 969); accord Fleischut v. Nixon Detroit Diesel, Inc., 859 F.2d 26, 29 (6th Cir. 1988) (citation omitted); Glasser, 632 F.Supp.2d at 665. A court must make both findings before issuing a § 10(j) injunction. See Ahearn, 351 F.3d at 234.

To establish reasonable cause, the Board has a "relatively insubstantial burden" to "produce some evidence in support of the petition . . . . [Petitioner] need not convince the court of the validity of the Board's theory of liability, as long as the theory is substantial and not frivolous." Gottfried v. Frankel, 818 F.2d 485, 494 (6th Cir. 1987). Temporary relief is "just and proper" when it is "necessary to return the parties to status quo pending the Board's proceedings in order to protect

the Board's remedial powers under the Act." <u>Kobell for and on</u>
<u>Behalf of N.L.R.B. v. United Paperworkers</u>, 965 F.2d 1401, 1410
(6th Cir. 1992).  The "status quo" is defined as the condition
"existing *prior* to the adoption of the allegedly unfair labor
practice." <u>Id.</u> (emphasis in original).

In applying the "reasonable cause/just and proper"
standard, "fact-finding is inappropriate."  <u>Ahearn</u>, 51 F.3d at
237.  District courts should not resolve conflicting evidence or
make credibility determinations.  <u>Id.</u>

Kellogg argues that the Court must find that Kellogg's
proposals clearly and unmistakably altered a term of the Master
Agreement to grant the Petition.  The clear and unmistakable
standard is the "Board's traditional test for determining
whether an employer's unilateral actions are lawful." <u>Provena</u>
<u>Hospitals</u>, 350 NLRB 808, 808 (2007).  The standard was
introduced in <u>Tide Water Associated Oil Co.</u>, 85 NLRB 1096
(1949), where the Board held that the Union did not waive the
right to bargain over pensions by agreeing to a broadly worded
Management Functions clause.  <u>Id.</u> at 1098.

> Since then, in decisions too numerous to cite, the
> Board has applied the clear and unmistakable waiver
> analysis to all cases arising under Section 8(a)(5)
> where an employer has asserted that a general
> management-rights provision authorizes it to act
> unilaterally with respect to a particular term and
> condition of employment.

Provena Hospitals, 350 NLRB at 812. The Supreme Court has adopted the standard. See, e.g., Metropolitan Edison Co. v. N.L.R.B., 460 U.S. 693, 708 (1983). In Metropolitan Edison Co., the Supreme Court held that it would "not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is 'explicitly stated.' More succinctly, the waiver must be clear and unmistakable." Id.

The waiver standard does not apply here. Petitioner's claim is not that Kellogg unilaterally changed provisions of the Master Agreement, and Kellogg's defense is not that the Union waived its right to bargain over the wages of new Regular employees. The dispute is about whether Kellogg's demands on Casual employees effectively altered the terms of employment of new Regular employees, an issue the parties agree was not a mandatory subject of bargaining. Traditionally applied as a "shield" against unilateral action by an employer, Kellogg can point to no authority in which the "clear and unmistakable" standard has been used as a "sword" against a union in a § 10(j) action. The appropriate standard here is the "reasonable cause/just and proper" standard. See Ahearn, 351 F.3d at 234.

## IV. Analysis

The parties agree that forcing impasse over terms settled in the Master Agreement would violate the Act. They disagree

about whether Kellogg's proposals for a new Supplemental Agreement would alter the Master Agreement. Kellogg argues that, because the Master Agreement does not define a Casual employee, Kellogg is free to negotiate changes to the Casual employee program without violating the Master Agreement. Petitioner argues that Kellogg's insistence on changes to the terms of Casuals' employment would alter the terms of employment of new Regular employees, a modification of the Master Agreement.

Sections 8(a)(5) and 8(d) of the Act require employers to bargain in good faith with respect to wages, hours, and other terms of employment. See 29 U.S.C. § 158(a)(5)&(d). Vanguard Fire & Supply Co., Inc. v. N.L.R.B., 468 F.3d 952, 960 (6th Cir. 2006) (citing Fibreboard Paper Prods. Corp. v. NLRB, 379 U.S. 203, 2010 (1964)). Parties are not required to bargain over non-mandatory subjects. Vanguard, 468 F.3d at 960. The parties have no duty "to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract." 29 U.S.C. § 158(d). "A party who insists upon a non-mandatory subject to impasse or as a precondition to bargaining violates [Section 8(a)(5)] of the Act." Vanguard, 468 F.3d at 960.

Imposing a lockout over the failure to agree to non-mandatory terms also violates § 8(a)(1) & (3) of the Act. See Teamsters Local Union No. 639 v. N.L.R.B., 924 F.2d 1078, 1082 (D.C. Circuit 1991). Section 8(a)(1) makes it unlawful to "coerce employees in the exercise" of their bargaining rights under the Act. 29 U.S.C. § 158(a)(1). Section 8(a)(3) makes it an unfair labor practice to "discriminat[e] in regard to hire or tenure of employment or any term or condition of employment to discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). Imposing a lockout over non-mandatory terms is unlawfully coercive and "discriminate[s] against the employees for their participation in protected collective bargaining activity." See Teamsters Local Union No. 639, 924 F.2d at 1082. "Unless the parties have expressly agreed to midterm modifications of a fixed term contract, economic pressures may not be invoked in the furtherance of demands for contract modifications." Chesapeake Plywood, 294 NLRB 201, 211 (1989), enfd. Mem. 917 F.2d 22 (4th Cir. 1990). See also C & S Industries, 158 NLRB 454, 457 (1966); St. Vincent Hospital, 320 NLRB 42, 49 (1995).

### A. Reasonable Cause

There is reasonable cause to believe that Kellogg has engaged in unfair labor practices. Petitioner has offered significant evidence supporting a substantial theory of

liability.  See Gottfried, 818 F.2d at 494.  Petitioner's burden
to establish reasonable cause is "relatively insubstantial,"
"inasmuch as the proof requires only that the Board's legal
theory underlying the allegations of unfair labor practices be
'substantial and not frivolous' and that the facts of the case
be consistent with the Board's legal theory."  Ahearn, 351 F.3d
at 237.  Put differently, "[Petitioner] must present enough
evidence in support of its coherent legal theory to permit a
rational factfinder, considering the evidence in the light most
favorable to [Petitioner], to rule in favor of [Petitioner]."
Glasser, 379 F. App'x at 486.

Petitioner's substantial legal theory is that Kellogg's
proposed terms on Casual employees are contrary to and would
modify terms in the Master Agreement.  Thus, Kellogg's terms
would be an unlawful basis on which to force impasse and impose
a lockout under § 8(a)(1), (3) and (5) of the Act.  Significant
evidence supports Petitioner's theory.  The Master Agreement
governs the wages of new Regular employees and sets their pay
schedule, and the totality of Kellogg's proposal would have
resulted in changes to those wage rates.

As their own negotiators admitted, Kellogg sought to change
the definition of Casuals to "basically what a new hire is
today."  (Jt. Ex. 3(e) at 17.)  Kellogg's proposals would have
made Causals the same as Regulars except for Casuals' pay and

14

benefits, and would have removed any limit on Kellogg's ability to hire them. Kellogg also admitted that, under its proposal, it could lay off Regular employees and bring them back as Casuals. Kellogg would never have to hire another Regular employee, and Casuals would be the "employee[s] of the future." (Meeting Tr., Jt. Ex. 3(a) at 9.) In effect, Kellogg's proposals were not to change the Casual employee program, as it insists it had the right to demand. Rather, Kellogg effectively demanded changes to the wage rates of new or rehired Regular employees. Those rates are set in the Master Agreement. The good-faith bargaining required by the Act does not allow Kellogg to use creative semantics to force midterm changes in the wages of new or rehired Regular employees in violation of the Master Agreement.

If Kellogg forced impasse over the wage rates of new Regular employees, which this Court finds substantial basis for concluding, Kellogg violated § 801(a)(1), (3), and (5) of the Act. The wage rates of new Regular employees were not mandatory terms of bargaining, and Kellogg forced impasse and locked out its employees because of the Union's failure to negotiate and agree to Kellogg's proposed modifications of those wage rates. See Vanguard, 468 F.3d at 960; Teamsters Local Union No. 639, 924 F.2d at 1082. There is reasonable cause to believe that Kellogg has engaged in unfair labor practices.

## B. Just and Proper

The "just and proper" element turns on whether a temporary injunction is necessary to protect the Board's remedial powers under the Act. See id. at 239. The court "must determine whether it is in the public interest to grant the injunction, so as to effectuate the policies of the [Act] or to fulfill the remedial function of the Board." Schaub, 250 F.3d at 970 (quotation marks omitted). The Board's remedial powers are undermined when "the circumstances of a case create a reasonable apprehension that the efficacy of the Board's final order may be nullified, or the administrative procedures will be rendered meaningless." Sheeran v. Am. Commercial Lines, Inc., 683 F.2d 970, 979 (6th Cir. 1982). An injunction is just and proper when it preserves the remedial power of the board by returning the parties to the status that existed "before the charged unfair labor practices took place[.]" Fleischut, 859 F.2d at 30 n.3.

Petitioner has requested an order directing Kellogg to cease:

(a) Refusing to bargain in good faith with the Union as the exclusive collective bargaining representative of the unit employees by insisting to impasse on bargaining proposals that are nonmandatory subjects of bargaining;

(b) Locking out the bargaining unit employees in furtherance of unlawful conduct calculated to frustrate its employees' bargaining rights;

(c) Threatening to lock out the bargaining unit employees in furtherance of unlawful conduct

16

> > calculated to frustrate its employees' bargaining
> > rights; and
>
> (d) In any other manner interfering with,
> restraining, or coercing its employees in the
> exercise of their Section 7 rights.

(Petition, D.E. 5 at 8.) Petitioner also asks the Court to

order that Kellogg take the following affirmative steps:

> (a) Recognize and, upon request, bargain in good
> faith with the Union as its employees' exclusive
> collective-bargaining representative concerning
> their wages, hours, and other terms and
> conditions of employment;
>
> (b) Within five (5) days of this Order, offer each
> and every bargaining unit employee locked out on
> October 22, 2013, full and immediate interim
> reinstatement to his or her former position at
> the terms and conditions in effect on that date,
> or, if those positions no longer exist, to
> substantially equivalent positions, without
> prejudice to their seniority or other rights and
> privileges, displacing, if necessary, any newly
> hired or reassigned workers;
>
> (c) Post copies of the district court's order at
> Respondent's facility in all locations where
> notices to employees are customarily posted,
> including the website
> www.kelloggnegotiations.com; said postings shall
> be maintained during the pendency of the Board
> proceeding free from all obstructions and
> defacements[;] and . . . the Regional Director
> of Region 15 of the Board [shall have] reasonable
> access to [Kellogg's] facility to monitor
> compliance with this posting requirement; and
>
> (d) Within twenty (20) days of the issuance of this
> Order, serve upon the District Court, and submit
> a copy to the Regional Director of Region 15 of
> the Board, a sworn affidavit from a responsible
> [Kellogg] official describing with specificity
> the manner in which [Kellogg] has complied with
> the terms of the Court's order, including the
> locations of the documents to be posted under the
> terms of the Order.

(Id. at 9-10.)

It is just and proper to grant Petitioner's requested relief. The lockout, which has deprived the employees of their pay and health insurance, has been ongoing for nine months. The administrative process may continue for many months and even years to come. To allow the lockout to continue through that period would place significant hardship on employees in furtherance of Kellogg's bargaining position, which Petitioner has reasonable cause to believe is unlawful. That would undermine the remedial powers of the Board. An injunction that ends the lockout and compels Kellogg to negotiate in good faith without forcing impasse on provisions in the Master Agreement would return the parties to their status prior to the lockout. See Ahearn, 351 F.3d at 234; Kobell, 965 F.2d at 1410.

Accordingly, it is just and proper to end the lockout and prohibit Kellogg from forcing impasse over terms in the Master Agreement, including any terms that would allow Casuals to subsume all new hires at pay below that provided for new Regulars in the Master Agreement. The posting and monitoring requirements Petitioner requests will help ensure that the Board's remedial powers are not undermined by a failure to adhere to the other requirements of this Order.

**V.  Conclusion**

For the foregoing reasons, there is reasonable cause to believe that Kellogg has engaged in unfair labor practices and that the injunctive relief requested by Petitioner is just and proper.

The Court ORDERS Kellogg, its officers, representatives, supervisors, agents, employees, and all persons acting on its behalf or in participation with it, to cease from the following acts and conduct, pending the final disposition of the matters involved herein by the Board:

(a) Refusing to bargain in good faith with the Union by insisting to impasse on proposals that would effectively change the wage rates of new Regular employees, or would allow Kellogg to hire only new Casual employees;

(b) Locking out the bargaining unit employees in furtherance of a bargaining position that would effectively change the wage rates of new Regular employees, or would allow Kellogg to hire only new Casual employees;

(c) Threatening to lock out the bargaining unit employees in furtherance of a bargaining position that would effectively change the wage rates of new Regular employees, or would allow Kellogg to hire only new Casual employees; and

(d) In any other manner interfering with, restraining, or coercing Kellogg's employees in the exercise of their Section 7 rights.

Kellogg is further ORDERED to:

(a) Recognize and, upon request, bargain in good faith with the Union as Kellogg's employees' exclusive collective-bargaining representative concerning their wages, hours, and other terms and conditions of employment;

(b) Within five (5) days of this Order, offer each and every bargaining unit employee locked out on October 22, 2013, full and immediate interim reinstatement to his or her former position at the terms and conditions in effect on that date, or, if those positions no longer exist, to substantially equivalent positions, without prejudice to the employee's seniority or other rights and privileges, displacing, if necessary, any newly hired or reassigned workers;

(c) Post copies of this Order at Kellogg's Memphis facility in all locations where notices to employees are customarily posted, including the website www.kelloggnegotiations.com; those postings shall be maintained during the pendency of the Board proceeding free from all obstructions and defacements; and the Regional Director of Region 15 of the Board shall have reasonable access to Kellogg's Memphis facility to monitor compliance with this posting requirement; and

(d) Within twenty (20) days of the issuance of this Order, serve upon the District Court, and submit a copy to the Regional Director of Region 15 of the Board, a sworn affidavit from a responsible Kellogg official describing with specificity the manner in which Kellogg has complied with the terms of this Order, including the locations of the documents to be posted under the terms of the Order.

So ordered this 30th day of July, 2014.

s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE